UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BIODIVERSITY CONSERVATION ALLIANCE, WYOMING WILDERNESS ASSOCIATION, and the WYOMING CHAPTER OF THE SIERRA CLUB,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES BUREAU OF LAND MANAGEMENT, a bureau within the Department of the Interior; GALE A. NORTON, in her official capacity as the Secretary of the Interior; and TED A. MURPHY, in his official capacity as the Assistant Field Manager, Lands & Minerals, Bureau of Land Management,<br><br>Defendants. | FILED<br>NOV 10 2005<br>NANCY MAYER WHITTINGTON, CLERK<br>U.S. DISTRICT COURT<br><br>Civ. Action No. 04-822 (RJL) |

MEMORANDUM OPINION
(November 10, 2005) [#10, 13]

Plaintiffs, Biodiversity Conservation Alliance, Wyoming Wilderness Association, and Wyoming Chapter of the Sierra Club (collectively "Biodiversity" or "plaintiffs"), bring this action against the United States Bureau of Land Management ("BLM"), Gale A. Norton, the Secretary of the Interior, and Ted A. Murphy, the Assistant Field Manager in BLM's Rock Springs, Wyoming Field Office (collectively "BLM," "the agency," or "defendants").

1



Plaintiffs contend that the BLM's December 9, 2003 Decision Record and Finding of No Significant Impact ("DR/FONSI") authorizing the Hay Reservoir 3D Geophysical Project ("Hay Reservoir Project" or "Project") violates the Administrative Procedure Act's ("APA") prohibition against agency decision making that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2003). More precisely, plaintiffs argue that the BLM's approval of the Project violates the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701 *et seq*. and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*.[1]  Compl. ¶ 1. Pending before the Court are cross motions for summary judgment. Upon due consideration of the parties' submissions, the relevant law, and the entire record herein, the Court finds that the agency's action was neither arbitrary, capricious, nor an abuse of discretion. Accordingly, the defendants' motion is GRANTED and the plaintiffs' motion is DENIED.

## I. BACKGROUND

*A.    Factual Background*

The proposed action at issue in this case, the Hay Reservoir 3D Project, seeks to explore for oil and natural gas reserves in a 279 square mile tract of land in southwestern Wyoming.  Environmental Assessment ("EA") at 1, Administrative Record ("AR") 32. Pursuant to the Project, potential reserves will be detected through a 3D seismic testing

---

[1] The BLM administers public lands within the framework of numerous overlapping statutes. The most comprehensive of these laws is the FLPMA. Through the FLPMA, Congress has charged the BLM with "multiple use management," which requires the BLM to balance the competing uses of public land. *See Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 877 (1990). Thus, the BLM's decisions in this case must comport with FLPMA's substantive requirements and NEPA's procedural mandate.

technique, which involves generating ground vibrations or seismic waves and recording the waves at various source points and receiver points located throughout the project area. *Id.* The process will yield an underground map of potential oil and natural gas reserves. Pls.' Mot. For Summ. Judg., Ex. 4 at 2.

Preparing the project area and conducting the seismic operation is a multi-step process. *Id.* at 4. A crew of eight to twelve surveyors must first stake and tag sixty-two "receiver lines" and sixty-one "source lines" throughout the project area using global positioning system ("GPS") technology.[2] *Id.* at 4-5. Once a sufficient number of lines are staked and tagged with receiver and source points, vibrator buggies ("vibe-buggies" or "buggies") are used to generate seismic waves. *Id.* at 6.

Working in pairs, the buggies proceed along source lines pursuant to a predetermined route. At each source point, the buggies lower 4.5 by 7.5 foot vibrator pads from their undercarriage. *Id.* The vibrator pads shake the ground and send shock waves throughout subsurface soil and rock. EA at 6, AR 32. Each vibe-buggy is 12 feet 6 inches high, 35 feet 6 inches long, and 11 feet 6 inches wide; they weigh 62,000 pounds and are equipped with 43 inch wide tires with a ground pressure of 16 pounds per square inch. *Id.*

The project area encompasses 178,560 acres of public and private land in Sweetwater

---

[2] "Receiver" lines contain sensors every 222 feet, which measure and analyze seismic vibration. EA at 5, AR 32. The receiver lines themselves are spaced 1,540 feet apart and are aligned northeast and southwest across the project area. *Id.* "Source" lines, by contrast, contain the vibration points through which the vibe-buggies generate the seismic vibration. *Id.* Vibration points are situated every 311 feet along source lines. *Id.* The source lines generally run northeast and southwest in a zigzag pattern between receiver lines. *Id.* The Project contemplates a total of 22,570 receiver points and 22,957 source points. *Id.* at 5-6.

technique, which involves generating ground vibrations or seismic waves and recording the waves at various source points and receiver points located throughout the project area. *Id.* The process will yield an underground map of potential oil and natural gas reserves. Pls.' Mot. For Summ. Judg., Ex. 4 at 2.

Preparing the project area and conducting the seismic operation is a multi-step process. *Id.* at 4. A crew of eight to twelve surveyors must first stake and tag sixty-two "receiver lines" and sixty-one "source lines" throughout the project area using global positioning system ("GPS") technology.[2] *Id.* at 4-5. Once a sufficient number of lines are staked and tagged with receiver and source points, vibrator buggies ("vibe-buggies" or "buggies") are used to generate seismic waves. *Id.* at 6.

Working in pairs, the buggies proceed along source lines pursuant to a predetermined route. At each source point, the buggies lower 4.5 by 7.5 foot vibrator pads from their undercarriage. *Id.* The vibrator pads shake the ground and send shock waves throughout subsurface soil and rock. EA at 6, AR 32. Each vibe-buggy is 12 feet 6 inches high, 35 feet 6 inches long, and 11 feet 6 inches wide; they weigh 62,000 pounds and are equipped with 43 inch wide tires with a ground pressure of 16 pounds per square inch. *Id.*

The project area encompasses 178,560 acres of public and private land in Sweetwater

---

[2] "Receiver" lines contain sensors every 222 feet, which measure and analyze seismic vibration. EA at 5, AR 32. The receiver lines themselves are spaced 1,540 feet apart and are aligned northeast and southwest across the project area. *Id.* "Source" lines, by contrast, contain the vibration points through which the vibe-buggies generate the seismic vibration. *Id.* Vibration points are situated every 311 feet along source lines. *Id.* The source lines generally run northeast and southwest in a zigzag pattern between receiver lines. *Id.* The Project contemplates a total of 22,570 receiver points and 22,957 source points. *Id.* at 5-6.

County, Wyoming.[3] EA at 1, AR 32. The project area is also located within the Red Desert Watershed Management Area, an area designated to protect visual, watershed, and wildlife resources. *Id.* at 3. Plaintiffs argue that the seismic-testing operation will adversely affect and irreparably injure native species, habitats, ecosystems and resources contained within this area. Compl. ¶ 32.

*B.    Procedural Background*

In December 2001, Veritas DGC Land Incorporated ("Veritas") filed a Notice of Intent ("NOI") with the BLM, an agency within the Department of the Interior, to Conduct Oil and Gas Geophysical Exploration Operations. AR 123. On April 30, 2002, BLM issued a news release soliciting public comments on the proposed Project for thirty days. AR 108. The news release indicated that the project area would encompass about 210 square miles. *Id.* Plaintiffs submitted two sets of comments during the scoping period. Pls.' Statement of Material Facts ("SMF") ¶¶ 9-19; Defs.' Statement of Material Facts and Issues at 11, ¶ 13.

On October 16, 2003, after the public comment period elapsed, Veritas sent a letter to the BLM requesting that the boundaries on the proposed project area be revised and expanded. AR 43. In December 2003, the BLM issued a DR/FONSI approving the proposed action pursuant to an EA also issued that month. DR/FONSI at 2, AR 32. The BLM concluded that the Project would: (1) primarily impact vegetation and visual resources in the project area; (2) displace approximately three percent of the ground surface; and (3)

---

[3]    Of the total acreage, 164,352 acres is BLM-administered public land, 9,728 acres is state-owned land, and 4,300 acres is privately owned. EA at 1, AR 32.

potentially damage or kill a percentage of brush within the vibe-buggy tire paths. EA at 30, AR 32. The BLM also expanded the project area by sixty-nine square miles from that referenced in the initial news release. *Id.*

Thereafter, plaintiffs filed a Notice of Appeal and a Petition for Stay with the Department of Interior's Interior Board of Land Appeals ("IBLA"). Pls.' SMF ¶ 21. After the IBLA denied plaintiffs' Petition for Stay, plaintiffs filed a Notice of Dismissal of Appeal, and commenced the instant action. *Id.* ¶ 25. In the instant action, plaintiffs seek an order declaring the DR/FONSI and EA violative of the APA and NEPA, Compl. at 17, ¶¶ A-B, and an injunction preventing the BLM from implementing the Project, *id.* ¶ E.

## II. STANDARDS OF REVIEW

*A.   Summary Judgment*

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In this case, where cross motions for summary judgment are at issue, the Court draws all reasonable inferences regarding the assertions made in a light favorable to the non-moving party. *Flynn v. Dick Corp.*, 2005 WL 1904018, *2 (July 29, 2005 D.D.C.). The Court will "grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not

genuinely disputed." *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 2005 WL 1773851, *2 (July 28, 2005 D.D.C.).

*B.     Administrative Review*

BLM's actions are reviewed by this Court in accordance with the judicial review provisions of the APA. When reviewing agency action under the APA, the Court must determine whether the challenged decision is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To make this determination, the Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971). At a minimum, the agency must have weighed the relevant data and articulated an explanation that establishes a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986). In the final analysis, the BLM's actions are "entitled to a presumption of regularity." *Volpe*, 401 U.S. at 415-16 (noting the court cannot substitute its judgment for that of the agency).

### III. ANALYSIS

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). The statute does not mandate particular results, but instead "imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposal and actions." *Dep't of*

*Transp. v. Public Citizen*, 541 U.S. 752, 756-57 (2004). The Council on Environmental Quality ("CEQ") is charged with administering NEPA and promulgating the regulations that become binding on all federal agencies. *See* 42 U.S.C. §§ 4342, 4344(3); 40 C.F.R. §§ 1501.1-1518.4.

NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for "major federal actions *significantly* affecting the quality of the human environment." 42 U.S.C. § 4332(c) (emphasis added). An environmental assessment ("EA") is made to determine whether an EIS is required. 40 C.F.R. § 1501.4, § 1508.9. The EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." *Id.* § 1508.9(a). If the agency determines that the proposed environmental impact will *not* be "significant," the agency must issue a "finding of no significant impact" ("FONSI"), *id.* § 1501.4(e), which "briefly present[s] the reasons why an action ... will not have a significant effect on the human environment," *id.* § 1508.13.

Although the agency has "primary responsibility for projecting whether the impact of [a] proposed action will be 'significant' within the meaning of [NEPA]," *Public Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 266 (D.C. Cir. 1988), the Court owes no deference to the BLM's interpretation of NEPA or the CEQ regulations because NEPA is addressed to all federal agencies, *Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150 (D.C. Cir. 2001). Courts in our Circuit review an agency's finding of no significant impact to determine whether:

> First, the agency [has] accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a hard look at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding.

*Town of Cave Creek, Arizona v. F.A.A.*, 325 F.3d 320, 327 (D.C. Cir. 2003). In the final analysis, this Court will not overturn the decision unless it was arbitrary, capricious, or an abuse of discretion. *City of Grapevine, Texas v. Dep't of Transp.*, 17 F.3d 1502-02 (D.C. Cir. 1994).

Plaintiffs argue that the BLM has violated NEPA in several respects.[4] Their arguments can be summarized as follows: (1) BLM failed to properly analyze the cumulative effects of the Project in the EA, Pls.' Mot. For Summ. Judg. at 11-17; (2) BLM did not consider an appropriate range of alternatives, *id.* at 27-32; and (3) BLM failed to adequately involve the public in the decision-making process, *id.* at 34-39. For the following reasons, each argument fails to meet the necessary standard to overturn the BLM's decision.

A.     *The EA Cumulative Impacts Analysis is Sufficient*

An EA must "include brief discussions of the need for the proposal, of alternatives ..., of the environmental *impacts* of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b) (emphasis added). "Impacts" may be direct, indirect, or, most relevant in this case, cumulative. "Cumulative impacts" are

---

[4] In Count 1 of their Complaint, plaintiffs asserted a claim for Failure to Prevent Unnecessary or Undue Degradation in violation of NEPA and FLPMA. Compl. ¶¶ 64-70. The parties, however, ignore this claim in their respective motions for summary judgment. As a result, the Court concludes that the claim has been abandoned and declines to discuss it further herein. *See Hammond v. Norton*, 370 F. Supp. 2d 226, 259 (D.D.C. 2005); *Jones v. District of Columbia*, 346 F. Supp. 2d 25, 41 n.2 (D.D.C. 2004).

impacts on the environment resulting from the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

Plaintiffs argue that the BLM did not sufficiently analyze the cumulative impact of past, present, and future oil and gas exploration in the project area. Pls.' Mot. For Summ. Judg. at 11. They assert that BLM has disregarded these impacts and analyzed the Hay Reservoir Project in a "vacuum." *Id.* at 11-12. I disagree.

The EA is not rendered unlawful simply because the BLM *could* have considered more impacts. *So. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102, 117 (D.D.C. 2004) ("[P]laintiffs' contention that "'they would have done more' does not render the cumulative impacts analysis violative of NEPA."). Indeed, to satisfy their obligations under NEPA, the BLM must only provide a *"realistic* evaluation of the total impacts." *Grand Canyon Trust*, 290 F.3d at 342 (emphasis added). The BLM did so here.

Additionally, the BLM devoted a section in the EA to evaluating potential cumulative impacts in which it concluded that "the proposed 3D vibroseis project *together with on-going activities* would not adversely effect elements of the human environment." EA at 30-31, AR 32 (emphasis added). Even if the Court assumes for the sake of discussion that this section is insufficient, as plaintiffs allege, Pls.' Mot. For Summ. Judg. at 12, the BLM overcame any

deficiencies in its analysis by also considering the Project's cumulative impacts in other sections throughout the EA, *e.g.*, EA at 1, AR 32 (noting the Project "overlies a known hydrocarbon-bearing geological structure with numerous producing wells located within the project area); *id.* at 3, AR 32 (noting that "well drilling in portions of the [project area] is on-going"); *id.* at 17, AR 32 (noting that "[o]il and gas exploration is an on-going activity within the project area. Records indicate that 71 producing gas wells ... lie within the project boundary, along with associated access roads, pipelines, and other related facilities"); *id.* at 18, AR 32 (Map depicting producing gas wells located in the project area). Accordingly, the concludes that the BLM's cumulative impacts analysis comports with NEPA.

B.   *The BLM Considered an Appropriate Range of Alternatives*

When preparing an EA, federal agencies must include a "brief discussion[]" of alternatives to the proposed action. 40 C.F.R. § 1508.9(b); *see also* 42 U.S.C. § 4332(E) (noting that an agency must "study, develop, and describe appropriate alternatives to recommended course of action"). Although the agency is responsible for determining the range of alternatives to be considered, *North Slope Borough v. Andros*, 642 F.2d 589, 601 (D.C. Cir. 1980), its decision in the final analysis must be reasonable, *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294-95 (D.C. Cir. 1988); *So. Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48, 51 (D.D.C. 2002) (stating that courts review an agency's consideration of alternatives under the "rule of reason").

In this case, the BLM's consideration of alternatives was entirely reasonable. By the

10

plaintiffs' own admission, there are only a limited number of feasible ways to acquire subsurface geologic data for oil and natural gas development, Pls.' Mot. For Summ. Judg. at 30-31, and the BLM expressly considered and rejected three alternatives that this Court believes is representative of the spectrum of available methods, *see* EA at 13, AR 32 (rejecting "man-portable drilling" as not technically, physically or economically feasible); EA at 13-14 (rejecting "heliportable drilling" as not logistically or economically feasible); EA at 14 (rejecting "poulter shot" as inefficient and not in harmony with the proposed action's purpose and need).

Plaintiffs argue the BLM has violated NEPA nonetheless because it did not consider and reject the shot-hole method. Pls.' Mot. For Summ. Judg. at 29. I disagree. A careful review of the record demonstrates that the BLM *did* in fact consider, and reject, the shot-hole method before authorizing the proposed action.[5] Unlike vibroseis, the shot-hole method requires the drilling of thousands of holes, to great depths, in an attempt to locate oil and natural gas. AR 4 at 13. In December 2002, the BLM acknowledged receiving plaintiffs' comment urging the BLM to consider the shot-hole method. AR 79 (letter from BLM to Mr. Erik Molvar of the Biodiversity Conservation Alliance). Subsequently, the BLM concluded in the EA that drilling alternatives requiring the excavation of such "dry holes" would disturb vegetation cover more than seismic exploration. EA at 30, AR 32. Indeed, the BLM

---

[5] As noted previously, plaintiffs provided the BLM with public comments on May 9, 2002 and May 27, 2002. Pls.' SMF ¶ 13. In the first comment, plaintiffs recommended the BLM consider the shot-hole method as an alternative to the proposed action. Scoping Comments at 3-4, AR 9.

11

concluded that "[s]eismic exploration is *the least* surface disturbing means" to achieve the proposed action's objectives. *Id.* at 30-31 (emphasis added). Thus, the rejection of drilling alternatives in the EA constitutes a sufficient justification for excluding the shot-hole method. Accordingly, given the objectives of the proposed action, the sensitive environmental concerns in the project area, and comments submitted during the public comment period, the BLM's consideration of alternatives was entirely reasonable.[6]

C.   *The BLM Adequately Involved the Public*

All three statutory and regulatory schemes implicated in this case (e.g., FLPMA, NEPA, and the CEQ regulations) require the BLM to involve the public in its decision-making process. *E.g.*, 43 U.S.C. § 1739(e) (requiring the BLM to give "the public adequate notice and an opportunity to comment upon" the "preparation and execution of plans and programs for, and the management of, public lands"); 40 C.F.R. § 1506.6 ("Agencies shall ... [m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures.").

As noted previously, the CEQ regulations contemplate two types of environmental documents: an EA and an EIS. *See* 40 C.F.R. § 1508.9 (defining EAs); *id.* § 1508.11

---

[6] Plaintiffs also argue the BLM violated NEPA by failing to consider a "hybrid" alternative. Pls.' Mot. For Summ. Judg. at 32-34. More precisely, they contend that the BLM should have considered "hybridiz[ing] various exploration technologies (e.g., buggy-mounted, man-portable, heliportable drilling, and the hand-laying of equipment) to form an alternative ...." *Id.* at 32. I disagree. The plaintiffs failed to urge the BLM to consider this alternative in their comments to the proposed action and, therefore, they have forfeited their opportunity to challenge the EA on this basis at this time. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (holding that a party "forfeited any objection to the EA on the ground that [the agency] failed to adequately discuss potential alternatives" where the alternative was not identified in the party's public comment). In any event, the BLM adequately identified the appropriate range of alternatives to the proposed action and complied with its obligations under NEPA and the regulations.

(defining EISs). Each document serves a slightly different purpose and, thus, has different requirements. In this regard, the EA is the more concise document, *compare* 40 C.F.R. § 1508.9 (an EA "[m]eans a concise public document"), *with id.* § 1508.11 (an EIS "means a detailed written statement"), primarily designed to provide sufficient information to establish that the agency took a "hard look" at the environmental consequences before concluding they are insignificant, *see Town of Cave Creek, Arizona*, 325 F.3d at 327.

Plaintiffs argue the BLM should have given the public an opportunity to comment on a draft EA, and should have notified the public before expanding the project area's boundary by sixty-nine square miles. Pls.' Mot. For Summ. Judg. at 37. I disagree.

A plain reading of the CEQ regulations reveals that an agency is *not* expressly required to circulate a draft EA for public comment before adopting its final decision, except in limited circumstances that do not apply here. *See* 40 C.F.R. § 1501.4(e)(2). Instead, in preparing an EA, the regulations only require that an "agency shall involve ... the public, *to the extent practicable*, ...."[7] *Id.* § 1501.4(b) (emphasis added). Determining whether the public was adequately involved is a fact-intensive inquiry made on a case-by-case basis. For the following reasons, the BLM not only adequately involved the public in this case, its failure to solicit supplemental comments before expanding the project area is of no legal

---

[7] At least one Circuit does interpret the regulations to mean that an agency must give the public an opportunity to comment on draft EAs. *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003). *Citizens*, however, is neither binding on this Court, nor, in this Court's judgment, consistent with a plain reading of the regulations. *See, e.g. Alliance to Protect Nantucket Sound v. U.S. Dep't of Army*, 398 F.3d 105, 115 (1st Cir. 2005) (rejecting the Ninth Circuit's interpretation as set forth in *Citizens* and holding that "[n]othing in the CEQ regulations requires circulation of a draft EA for public comment").

consequence.

BLM advised the public of Veritas's proposal, allowed a thirty-day public comment period, and did not issue the DR/FONSI until after considering the issues raised during that period. *See* DR/FONSI at 3, AR 32. Although the regulations do require an agency to supplement a draft or final *EIS* if it makes "substantial changes" in its proposed action, *see* 40 C.F.R. § 1502.9(c)(1), plaintiffs have not cited any binding authority to support their argument that the regulations require an agency to solicit supplemental public comments when there are changes to the proposed action before the *EA* has been issued. Moreover, even in contexts where the regulations require supplementation, our Circuit Court has explained that supplementation is only necessary when "new information provides a *seriously different picture of the environmental landscape.*" *Nat'l Comm. for the New River v. F.E.R.C.*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (internal quotations omitted) (emphasis in original). Here, the BLM expanded the project area's boundary by sixty-nine square miles based upon Veritas's request. AR 43. The BLM noted the revised project area in the DR/FONSI and stated that the "slight[]" increase had been analyzed. DR/FONSI at 13, AR 32. Accordingly, the BLM's involvement of the public fully comports with the FLPMA and NEPA.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment and DENIES plaintiffs' motion for summary judgment. An appropriate order will issue contemporaneously herewith.

_____
RICHARD J. LEON
United States District Judge